## Case No. 14,003.

### THORP et al. v. The DEFENDER.

[1 Bond, 397.] [1]

District Court, S. D. Ohio. Oct. Term, 1860.

COLLISION—RIVER NAVIGATION—RULES—ASCENDING AND DESCENDING BOATS—CROSSING CHANNEL—DAMAGES.

1. The second rule of navigation adopted by the board of supervising inspectors, under the steamboat law of 1852 [10 Stat. 61], giving an ascending boat the right to choose the side she prefers to take, when meeting a down boat, must have a reasonable construction, and can not be understood as giving the up-stream boat a right under all circumstances of choosing her line of navigation.

[Cited in The Marshall, 12 Fed. 922.]

2. If an ascending boat is coming up on one shore, and a down boat is seen above on the opposite side, the river being wide, with an ample depth of water in the intervening distance between the boats, and the up-stream boat is not required for business purposes to make a crossing, she ought by one sound of the whistle to signify her purpose of keeping up the same side. She has no right unnecessarily or capriciously to require the descending boat to change her course.

3. It is a sound rule of navigation applicable to the western rivers, recognized by courts exercising admiralty jurisdiction, that an ascending boat should not cross a channel when a descending boat is so near that it would be possible for a collision to occur.

4. A descending boat has a right to the channel of the river, and, while in her proper place, it is the duty of the ascending boat so to regulate her movements as to keep out of the way.

5. It is a great error, and one which must always incur hazard of a collision, for an ascending boat to attempt to cross the bow or in front of the descending boat unless the distance between them is such as to exclude the possibility of their coming in contact.

6. An up-stream boat, wishing to cross a channel when a boat is coming down, must either slacken her speed or stop altogether until the down boat has passed, and this rule is not affected by the fact that the signals between the boats give the ascending boat the choice of sides; for it is a paramount rule of navigation that, if possible, collisions must be avoided, and an error by one boat will not justify another in running into her unless it was unavoidable.

7. If a mutual fault occasions a collision, the damages for the injury must be divided between the boats; but if the fault was wholly on one side, the culpable boat must bear the entire loss.

[This was a libel by Oliver P. Thorp and others against the steamboat Defender.]

Mills & Hoadly, for libellants.

Lincoln, Smith & Warnock, for respondents.

OPINION OF THE COURT. This suit is prosecuted by the libellants, as owners of the steamboat William Baird, to recover damages for injuries resulting from a collision with the steamboat Defender, which occurred on the Mississippi river some sixty miles above Vicksburg, about twelve o'clock, in the night of November 4, 1856. The case made in the libel is, in brief, that the Baird, properly manned and equipped as a freight and passenger boat, was proceeding on a trip from New Orleans to St. Louis, and when near what is called the Tennessee landing, steering up the Mississippi shore, the pilot was about to make the usual crossing to the Louisiana shore, when he discovered the Defender about one mile above, coming down near the Louisiana side, and about to cross from that side to the opposite shore; that on seeing the descending boat, the pilot of the Baird sounded two blasts of the whistle as a signal that he wished to take the larboard side in passing the Defender, and that the pilot of the latter boat thereupon sounded his whistle twice, to indicate his acceptance of the Baird's signal; that the Baird, in accordance with the signals, was immediately pointed across toward the Louisiana shore, and in her efforts to get to the larboard, was running nearly square across the river; that the Defender pursued the proper course of a down boat, under the signals which had passed, until she came within a short distance of the Baird, and then straightened down stream, and came "head on" against the starboard quarter of the Baird, striking her about the middle of the boilers, displacing the boilers, breaking the connection steam-pipes, carrying away the starboard guard, and crushing in some of the planks of the hull, thereby causing the water to flow in rapidly, and endangering both the boat and cargo, and making it necessary to throw overboard a large quantity of salt and lumber, which were a part of her cargo.

The libel contains the usual averment that the collision resulted solely from the mismanagement and fault of those in charge of the Defender, and the libellants claim full damages for the loss of, and injuries to, the cargo, for the costs of repairing the injuries sustained, and for the detention of the boat while the repairs were in progress.

The answer of the respondents sets forth that the pilots of the Defender, the boat being near the Louisiana shore, at a point called Pecan Grove, saw the Baird coming up on the Mississippi side, and when nearly opposite Benhampton two whistles were heard from the Baird, indicating the wish of the pilot to pass up on the larboard side; that the signal, though unusual and not according to the proper course of navigation, was accepted by the pilot of the Defender, and responded to by two whistles; that he immediately pointed his boat toward the Mississippi shore, intending to make a long crossing, and heading to a point a short distance above Benhampton, thus leaving ample room for the

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

Baird to pass up on the Louisiana side, for which she had signaled; that in violation of her signal the Baird continued some distance up the Mississippi side, and when within one hundred yards of the Defender, suddenly changed her course to the larboard and ran nearly square across toward the Louisiana shore, and directly across the bow of the descending boat; that the Defender, being near the middle of the river, quartering toward the Mississippi shore, with her starboard bow struck the starboard quarter of the Baird, near the middle of the boilers, thereby giving a glancing blow, quartering aft in its course.

The respondents also aver that the Defender, after accepting the signal of the Baird, pursued the proper line of navigation, without any material change of direction; and that the sole cause of the collision was the sudden change of the Baird to the larboard, and her attempt to cross the bow of the Defender, when the boats were so near. The answer further avers, that the collision occurred just below the Tennessee landing, about one-third of the way from the Mississippi shore, and that it resulted solely from the fault of the Baird.

The answer also alleges that the Defender suffered damage to a small amount, for which the respondents claim compensation. And they also assert a claim for salvage service rendered the Baird, in saving the boat and cargo from entire loss.

The merits of this controversy obviously lie within a narrow compass. The parties agree in their statements of some of the facts involved in this collision. But as to the course and position of the boats previous to and at the time of the accident, their theories are in direct conflict, and both can not be sustained. The libellants contend that the Defender did not run in accordance with the signal given and accepted. They insist that, instead of crossing to the Mississippi shore, she kept near the middle of the river, and when within a hundred yards of the Baird, wrongfully changed her direction, and steered, head on, toward the Baird, and ran into her as she was crossing to the Louisiana side. On the other hand, the respondents insist that, in obedience to the signal, their boat, at the time of the collision, was passing down nearer the Mississippi than the Louisiana shore, slightly quartering toward the Mississippi side, in the usual and proper place for a descending boat, and that the Baird, in plain violation of an established rule of navigation, when the boats were from one hundred to two hundred yards apart, attempted to make a straight crossing directly across the bow of the Defender, and that by reason of this movement the Defender unavoidably, and without any fault on her part, came in contact with her.

As to some of the facts involved in this controversy there is no conflict, either in the statement of the parties or the evidence adduced. There is no dispute as to the signals which passed between the boats, nor is there any disagreement in the evidence, that the Baird was coming up, near the Mississippi side, when the Defender was first seen, about a mile above, near what the witnesses call a false point on the Louisiana shore. Nor is there any question that the river was wide the whole distance between the boats when the signals passed. It is equally certain there was sufficient depth of water for either boat, from shore to shore. It was about twelve o'clock at night, but not so dark as to prevent a boat from being distinctly seen a mile distant, or to render navigation difficult or dangerous.

In reference to these general facts, it is very obvious that the collision could not have occurred without fault of one or both boats. And the question presented is, which boat is to be held responsible for the injury and loss resulting from the collision. The respondents insist that the first error or fault was committed by the Baird in signaling for the larboard or Louisiana shore. And the preponderance of the proof as to the proper and usual way of navigating the river at that point sustains this view. There is no evidence that the Baird had any business call to the opposite shore, and no reason is perceived why she could not have kept up the Mississippi side, at least until the descending boat had passed. There was sufficient water along that shore, nor does it appear that there was any difficulty in pursuing that course. It would seem, therefore, that the pilot of the Baird erred in signaling for the larboard side. But it is insisted by the libellants that, by rule 2 of the rules of navigation adopted by the board of supervising inspectors under the steamboat law of 1852, it is the right of the ascending boat to choose the side she prefers to take when meeting a down boat. That rule provides that the pilot of the ascending boat shall, by one sound of the whistle, indicate his wish to keep to the starboard of the descending boat, and if he whistles for the larboard or left side, he is required to give two sounds of the whistle. And the descending boat is required to respond promptly by corresponding signals to signify the assent of the pilot to the signal from the other boat; and both boats are then to be steered in accordance with the signals. This rule must have a reasonable construction. It can not be understood as giving the up-stream boat a right, under all circumstances, of choosing her line of navigation. If the ascending boat is coming up on one shore, and a down boat is seen above on the opposite side, if the river is wide, with an ample depth of water in the intervening distance between the boats, and the up-stream boat is not required for business purposes to make a crossing, she ought, by one sound of the whistle, to signify her purpose of keeping up the same side. She has

no right, unnecessarily or capriciously, to require the descending boat to change her course. The object of this rule, and all other rules of navigation, is to avoid collisions. But it is obvious that the danger of collisions would be greatly increased if either boat, in the circumstances supposed, could by signals require the other boat to cross the river, and thus materially change her direction. There could be no possible danger of coming together if each kept on the course she was steering until they had passed each other. It would seem clear, therefore, that the Baird was wrong in claiming the larboard or Louisiana shore in ascending the river. But it is contended by the libellants, that if the signal of the Baird was erroneous, yet, as it was recognized and accepted by the pilot of the Defender, it can not be imputed to the former boat as a fault. I can, however, see no ground for holding that the acceptance of an erroneous signal, if injury results from such signal without any fault on the part of the boat which receives it, can exonerate the boat which gives it. In this case it was not a fault in the Defender that she signified her willingness that the Baird should have the choice of sides. It was not an admission that she had, under the circumstances of the case, a right to choose the larboard side; and the acceptance of the wrong signal only laid the obligation upon the Defender to obey it in good faith, and that the boat should be skillfully steered in accordance with it. If thus acting, and without fault in her navigation, the Defender came in contact with the Baird, and inflicted an injury on her which can be traced to the erroneous signal given by that boat, there is no ground on which she can be held responsible for it.

But there is no necessity to discuss, or to decide upon the effect of the erroneous signal by the Baird. There is another aspect of the case, that seems decisive of the question of fault, as between these boats. It is clear from the evidence that the Baird was not steered in accordance with the signal given and accepted, and that her course was in direct violation of a well-settled and imperative rule of navigation. It was clearly the duty of her pilot, under the signal he had given, if the distance between the boats was such as to have rendered a crossing practicable without danger of collision, to have passed at once to the larboard side. Instead of this, the weight of evidence clearly shows that, for some time after the signals passed, she kept up the Mississippi shore, quartering toward the Louisiana side, until the Defender was not exceeding two hundred yards above her, when she suddenly changed her course more to the larboard, and was, according to the evidence. on both sides, nearly square across the river, just preceding and at the time the boats came together. This fact is averred in the libel, and is amply sustained by the evidence. It

is equally certain, that the Defender, from the time she accepted the signal of the Baird, was steered, without any material deviation, on a line obliquely tending toward the Mississippi shore, and had progressed, at least, to the middle of the river, and, as many of the witnesses testify, was at the time of the collision nearer the Mississippi than the Louisiana shore. In this position of the two boats, a more palpable error can not well be conceived of, than that committed by the Baird, in attempting to pass in front of, or across the bow of the Defender. It would seem that when this attempt was made, the boats were not more than one hundred or one hundred and fifty yards apart, and a collision would be the inevitable result of attempting to cross before the descending boat. At the time this occurrence took place, there was an express rule adopted by the board of supervising inspectors, which prohibited such a course. That rule declared, that "it shall not be lawful for an ascending boat to cross a channel when a descending boat is so near that it would be possible for a collision to ensue therefrom." If such a rule had not received the sanction of the board of supervising inspectors, there can be no question that it must be recognized, by courts exercising admiralty jurisdiction, as a sound rule of navigation, applicable to the Western rivers. It is well settled that a descending boat has a right to the channel of the river, and that while in her proper place, it is the duty of the ascending boat so to regulate her movements as to keep out of the way. And it is very obvious that it is a great error, and one which must always incur the hazard of a collision, for the ascending boat to attempt to cross the bow, or in front of the descending boat, unless the distance between them is such as to exclude the possibility of their coming in contact. This rule of navigation has its foundation in good sense. Experience proves that in the navigation of the Western waters, great errors are often made in estimating distances, more especially at night or in bad weather. As a rule of prudence, therefore, the up-stream boat, wishing to cross a channel when a boat is coming down, must either slacken her speed, or stop altogether until the down boat has passed. And this rule is not affected by the fact that the signals between the boats give the ascending boat the choice of sides. It is a paramount rule of navigation that, if possible, collisions must be avoided, and an error by one boat will not justify another in running into her, unless it was unavoidable.

That the Defender was in the right place for a descending boat, at the time of the collision, near the middle of the river her head pointed toward the Mississippi shore, and that the Baird was running nearly at a right angle with the Louisiana shore, is not only proved by the witnesses who testify as to the course and position of the two boats,

but is conclusively established by a controlling fact in the case, which does not admit of doubt or controversy. The fact referred to is, that the blow received by the Baird was upon her starboard quarter, opposite the boilers, and raked aft for the distance of about twenty feet. Now, the theory of the libellants is—and such are the averments in the libel—that the Defender, after the signals, was steered correctly, until near the Baird, when she changed to the starboard, and came "head on" against the starboard side of the latter boat. Upon this theory, the Defender would have struck the Baird either at a right angle, or quartering in the direction of her bow. But, as before stated, the Defender came obliquely against the Baird, inflicting a glancing blow, raking toward the stern. The evidence most satisfactorily proves that this was the character of the blow. The carpenters on both boats so describe it in their depositions, and in the diagrams which they annex. And this fixes the position of the boats, at the time of the collision, with all the certainty of mathematical proof.

Upon the whole, the following conclusions are satisfactorily attained in regard to this collision: 1. That the Baird did not, in accordance with her signal, attempt an immediate crossing to the Louisiana shore, but kept up some distance near the Mississippi side, and was then turned nearly square across the river, and was in that position when the boats came together; 2. That the pilot of the Baird was greatly in fault in thus attempting to cross the bow of the descending boat; 3. That this error was the direct cause of the collision.

It remains only to inquire whether there was any fault on the part of the Defender, justifying a decree for a division of damage resulting from the collision. It is well settled, that if there was mutual fault, the damages for the injury must be divided between the boats; but if the fault was wholly on one side, the culpable boat must bear the entire loss. In my judgment there is no ground for such a division in the present case. The weight of the evidence shows clearly there was no fault in the management of the Defender. As to her course, the following propositions are sustained with reasonable certainty: 1. That the Defender, when the signal of the Baird for the larboard side was given and accepted, was descending nearest the Louisiana side, and that in accordance with the signal her course was immediately changed toward the Mississippi shore; 2. That being thus steered, without any material variation in her course, she had reached the middle of the river, and was probably nearer the Mississippi than the Louisiana side when the collision happened, thus leaving ample room for the Baird to pass to larboard, according to her signal; 3. That when the Baird turned suddenly to the larboard, attempting to cross in front of the Defender, the latter boat seeing the danger of a collision, did all she could to avoid it, in stopping and backing as soon as possible.

In their answers, the respondents have set up a claim for compensation for a salvage service in the aid rendered in saving the Baird and her cargo. There can be no doubt that the conduct of those in charge of the Defender after the collision was highly praiseworthy. They rendered prompt and efficient service to the injured boat, but they did no more than they were required to do by the obvious dictates of duty. And neither the boat nor cargo, or the persons on board the Defender, were in peril as the result of their interposition. Nor is it certain that the Baird or her cargo would have been lost, if no aid had been afforded by the Defender. But, without going further into the consideration of the salvage claim, I am quite clear in the conclusion that it ought not to be allowed.

The respondents also claim a decree for the injury sustained by the Defender from the collision. It appears from the evidence that she was slightly injured, and that the expense of repairing her was from fifty to one hundred dollars. Probably, under all the circumstances of the case, the lowest sum named would be an adequate compensation for the injury, and a decree for fifty dollars may be entered in favor of the respondents.